**Opinion issued August 30, 2012**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-10-01079-CV

————————————

**BANKCARD PROCESSING INTERNATIONAL, L.L.C., MERCHANT PROCESSING, INC., OLLIE S. ACKLEY, JEFF MAINE, KENNETH MAINE, DIVERSIFIED CHECK SOLUTIONS, L.L.C., DIVERSIFIED PAYMENT SOLUTIONS, L.L.C., ACHECK21, L.L.C., AND JEANINNE MCCONNELL, Appellants**

**V.**

**UNITED BUSINESS SERVICES, L.P., Appellee**

**AND**

**UNITED BUSINESS SERVICES, L.P., Appellant**

**V.**

**BANKCARD PROCESSING INTERNATIONAL, L.L.C., MERCHANT PROCESSING, INC., OLLIE S. ACKLEY, JEFF MAINE, KENNETH MAINE, DIVERSIFIED CHECK SOLUTIONS, L.L.C., DIVERSIFIED**

**PAYMENT SOLUTIONS, L.L.C., ACHECK21, L.L.C., AND JEANINNE MCCONNELL, Appellees**

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2006-30498**

## MEMORANDUM OPINION

United Business Services, L.P. ("UBS") entered into a business relationship with Bankcard Processing International, L.L.C. ("BPI") and Merchant Processing, Inc. ("MPI") for the purpose of forming a joint venture to provide electronic check imaging and processing services. After an unsuccessful test of the proposed services, BPI and MPI ended their relationship with UBS, and their owners created competing business entities. UBS filed suit and asserted claims for fraud, breach of fiduciary duty, and breach of contract against BPI, MPI, and several related entities and individuals.

After a jury trial, the court entered judgment in favor of UBS for $1.5 million. On appeal, the appellants contend that the damages award is not supported by legally sufficient evidence. Because the only evidence regarding damages did not conform to the measure of damages submitted to the jury, we conclude that there is no evidence to support the verdict. We reverse the trial

court's judgment, in part, and render judgment that UBS take nothing on its affirmative causes of action.

UBS also appealed from the trial court's judgment, arguing that the court erred in its pretrial ruling that the parties' confidentiality and nondisclosure agreements were unenforceable. The court did not specify a basis for its ruling on the motions for summary judgment, and on appeal, UBS did not address each possible ground on which the trial court could have based its ruling. Thus, we affirm the trial court's ruling on the motions for summary judgment.

Finally, UBS contends that because it was the prevailing party with respect to a counterclaim asserted against it by BPI for breach of contract, the trial court erred by denying its motions for contractual attorney's fees. UBS was entitled to recover attorney's fees under the parties' contract, so we reverse the judgment as to that issue, and we remand for further proceedings consistent with this opinion.

## Background

UBS was a limited partnership that provided merchant-processing services. BPI and MPI were similar businesses. BPI resold merchant-processing services, primarily to utilities. MPI resold merchant-processing services, primarily to municipalities. Kenneth Maine and Jeff Maine owned BPI. Ollie S. Ackley owned MPI.

In 2003, Congress passed the Check Clearing for the 21st Century Act ("Check 21 Act"), which authorized the electronic imaging and processing of checks. For approximately two years, UBS conducted research in contemplation of possibly entering this market, and it eventually contracted with two payment-processing software companies, U.S. Dataworks and Turbo Transactions.

The president of UBS met Jeff Maine at a golf tournament in mid-2004, and the two men began to discuss the possibility of working together to sell Check 21 services. In August 2005, BPI entered into a sales agreement with UBS, which provided that BPI would sell UBS's products. Later, the president of UBS also met with Ackley to discuss the prospect of MPI working with UBS and BPI to sell Check 21 services.

Before sharing the information it had collected regarding the Check 21 Act, the software needed to implement it, and the potential market for these services, UBS required Ackley and both of the Maines to sign confidentiality and nondisclosure agreements. In January 2006, UBS, BPI, and MPI signed a letter of intent describing their intention to work together as a new venture, selling both automatic clearing house (ACH) services and Check 21 services. Between January and April 2006, UBS tested its Check 21 products and services at customers' facilities. But the testing showed that the products failed to perform as anticipated.

4

In mid-April 2006, BPI and MPI informed UBS that they were discontinuing their relationship under the letter of intent, stating that their activities up to that point had been due diligence and noting the fact that UBS's products and services did not work. Five days later, the owners of BPI and MPI created their own companies to compete with UBS in the market for reselling Check 21 services. These new companies were Diversified Check Solutions, L.L.C., Diversified Payment Solutions, L.L.C., and ACheck21, L.L.C.

UBS sued BPI, MPI, their owners, and the companies they formed to compete in the Check 21 market. The lawsuit also named as defendants a software designer who had worked with UBS and provided information to BPI and MPI when they worked together under the letter of intent. Among other things, UBS alleged fraud and breach of fiduciary duty. BPI countersued for, among other things, breach of the 2005 sales agreement.

Before trial, the parties filed competing motions for summary judgment on the issue of the enforceability of the confidentiality and nondisclosure agreements. UBS argued that the agreements were unambiguous and enforceable as a matter of law. The defendants filed a cross-motion for partial summary judgment arguing that the nondisclosure agreements were not enforceable because the "confidential information" referenced by the agreements was equally available to the defendants before they signed the nondisclosure agreements, and such information was

5

already in the defendants' possession prior to signing the nondisclosure agreements. The defendants also argued that UBS had no possessory, proprietary, or ownership interest in the disputed "confidential information," which was not secret but in the public domain. Thus, the defendants contended there was no evidence of any improper disclosure or use of information that caused harm to UBS. The trial court denied UBS's motion for summary judgment and granted the appellants' motion without specifying the basis for its ruling.

At trial, UBS's expert accounting witness, Greg Cowhey, testified that he calculated a value for the proposed enterprise by projecting what its profits would have been based on the parties' own assumptions, i.e., that the product worked, the market accepted the product, potential contracts would be realized, and overall estimated levels of use of the product and growth in demand for their services would occur. After estimating the lost future profits, Cowhey calculated their present value using a discounted cash flow methodology. Cowhey testified that UBS's damages were approximately $3.7 to 4.2 million. He also testified that he never calculated a value for UBS, L.P. and that he disregarded its historical performance.

The damages question asked the jury to determine what sum of money would compensate UBS for damages caused by the defendants' wrongful acts. The jury was specifically instructed to consider only one element of damages—the

"benefit of the bargain"—and "none other." The charge further instructed the jury that "benefit of the bargain" means:

> the difference, if any, between the value of UBS, L.P.'s business after the individuals or entities committed the wrongful acts against UBS, L.P., and the value of UBS, L.P.'s business if the individuals or entities had not committed such wrongful acts against UBS, L.P.

The jury found in favor of UBS on its liability questions, finding that the appellants committed fraud and breached their fiduciary duties. The jury awarded $1.5 million in damages to UBS. The jury also found in favor of UBS on the defendants' counterclaim for breach of a 2005 sales agreement, finding that the defendants should take nothing by way of their counterclaim.

UBS moved for an award of contractual attorney's fees, arguing that it was the prevailing party. The defendants also sought statutory attorneys' fees based on the pretrial ruling that a covenant not to compete in the 2005 sales agreement was not enforceable. The trial court denied the motions for attorney's fees, reasoning that the awards of fees would cancel each other out.

The defendants appealed, raising three issues challenging the sufficiency of the evidence to support the jury's award of damages and one issue challenging UBS's standing to recover damages that the jury found were suffered by its general partner, UBS II, Inc. UBS also appealed, challenging the trial court's ruling on the competing partial motions for summary judgment and the court's ruling denying contractual attorney's fees.

7

**Analysis**

**I.    Defendants' appeal**

In their first issue, the defendants challenge the legal sufficiency of the evidence to support the damages award because it did not coincide with the measure of damages submitted to the jury. The jury was given the following question and instructions regarding damages:

> What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiff UBS, L.P., for its damages, if any, that resulted from or were proximately caused by the wrongful acts of the listed individuals or entities?
>
> . . . .
>
> Consider the following elements of damages, if any, and none other.
>
> "Benefit of the bargain" means the difference, if any, between the value of UBS, L.P.'s business after the individuals or entities committed the wrongful acts against UBS, L.P., and the value of UBS, L.P.'s business if the individuals or entities had not committed such wrongful acts against UBS, L.P.

Neither party objected to this part of the jury charge.

In the absence of an objection to the court's charge, we evaluate the sufficiency of the evidence in light of the court's charge as given to the jury. *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). In a legal sufficiency, or "no-evidence" review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we credit

8

favorable evidence if a reasonable fact-finder could, and we disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight accorded to their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

Gregory Cowhey, an accounting expert, testified about UBS's damages. His testimony focused primarily on his credentials and experience, the methodology he used to calculate UBS's damages, and the assumptions, estimates, and information he relied on in making his calculations. Cowhey testified that he determined "the present value of the future profits lost by virtue of the termination of the joint venture arrangement." He calculated the venture's lost future profits over a period of five years beginning December 31, 2006. He relied on two sets of projections to infer how the joint venture would have performed: one projection assumed the businesses of U.S. Dataworks, Turbocheck, and U.S. Clearing Systems were joined together, and the other projection was one prepared by the defendants in relation to

9

the anticipated profitability of Diversified Check Solutions.  Cowhey then used the discounted cash flow methodology to calculate the present value of the projected future earnings.  He testified that this method was "generally relied upon by experts" to "value businesses."

Cowhey testified about his opinion of the total damages UBS sustained as a result of the events that gave rise to the lawsuit.  He said that the damages were comprised of the capital invested and the "lost profits prospectively after the formation of the joint venture."  He testified that UBS's capital investment was approximately $1,051,000 and UBS's one-third share of the lost profits ranged from $2,657,000 to $3,213,000.  Thus, he opined that UBS's total damages were between $3,708,000 and $4,264,000.

As part of his valuation analysis, Cowhey did not calculate the value of UBS's business.  This was made evident during Cowhey's testimony at trial:

Q.    Now, with all these numbers you have been talking about you came [up] with between 2.6 and $3.2 million in damages, right?

A.    For the future profit component, yes.

Q.    And you came up with that by valuing a hypothetical joint venture, right?

A.    Yes.

Q.    Okay.  You did not value and didn't try to value the Plaintiff in this case, UBS Limited Partnership, did you?

A.    I was not asked to do that.

10

Q.     You weren't asked to and you didn't?

A.     That is correct.

Cowhey did testify that a value for UBS could be implied from a transaction in which a UBS investor agreed to convert a $300,000 loan into a 7% ownership interest in the partnership.   Based on that October 2005 transaction, Cowhey testified that a value of $4.26 million could be implied, but he emphasized that he did not rely on this method to estimate a value for UBS:

A.     That is not my valuation.  I said this again this morning.  That is their—the investor put up $300,000 and got back 7 percent. That's factually what happened.  . . .  This 7 percent represents 300.  Do the math.  What does 100 represent?  That is just a fact.

Q.     Okay.  And, so, 4.26 million . . . value is a fact, right?

A.     If you look at that transaction, that is what that tells you.  That is a mathematical fact.  If 300,000 equals 7 percent, then 100 percent equals 41285 [sic] that is just a mathematical factor.

Q.     And, so, UBS is worth $4.286 million in October of '05.  Did you look at their value as to how it looked, say, December 31, 2005?

A.     You asked me this before.  My answer is, again, I was never asked to value UBS at any date.

Q.     Did you ever try to look at a value of UBS on January 19th, 2006?

A.     You asked me that before and I said I was never asked to value UBS at any date.

11

Cowhey's opinion of UBS's damages was based solely upon his lost-profits analysis. But Cowhey's testimony does not support any amount of damages as measured by the instructions submitted to the jury, which is the standard we use to evaluate the sufficiency of the evidence. The jury was not asked to consider lost profits as an element of damages. Rather, the jury was instructed to consider only one potential element of damages, "and none other." The sole element of damages submitted to the jury was the "benefit of the bargain," defined in the jury charge as "the difference, if any, between the value of UBS, L.P.'s business after the individuals or entities committed the wrongful acts against UBS, L.P., and the value of UBS, L.P.'s business if the individuals or entities had not committed such wrongful acts against UBS, L.P."

Even to the extent that a reference to a company's "business" might be understood as a colloquial reference to its profits, that understanding of "business" cannot be squared with the instruction given to the jury, which required a comparison of two values of the "business"—one valuation "after the individuals or entities committed the wrongful acts against UBS, L.P.," and another valuation of "UBS, L.P.'s business if the individuals or entities had not committed such wrongful acts against UBS, L.P." The only way the jury could have even attempted to measure the benefit of the bargain, as defined by the jury instructions and based upon Cowhey's lost-profits analysis, would be to assume that the value

12

of "UBS, L.P.'s business after the individuals or entities committed the wrongful acts against UBS, L.P." was zero. But Cowhey offered no opinion that UBS's "business" became utterly worthless upon the dissolution of the nascent joint venture, and the record would not support any such conclusion in light of the fact that UBS was an ongoing business concern separate and apart from the new business opportunity it had hoped to exploit with BPI and MPI as its co-venturers.

To the extent that the instruction given to the jury is given its more natural reading, which suggests that the jury should assess the value of UBS as a "business" (as opposed to its mere expectation of profits from a new business opportunity, projected over a fixed period of time), Cowhey's opinion testimony supplied no evidence upon which the factfinder could assess the value of UBS. In particular, a reasonable factfinder could not disregard his repeated testimony that he did not establish a value for UBS, L.P. at any time because he was never asked to do so. *See City of Keller*, 168 S.W.3d at 822. Nothing in Cowhey's testimony proves the value of UBS's business after the defendants' wrongful acts or in the absence of such wrongful acts.

No evidence supports the damages awarded in this case as measured against the jury instruction. Accordingly, we conclude that, based on this record, no reasonable and fair-minded factfinder could have found that UBS sustained damages in the amount of $1.5 million. *See id.* at 827. We hold that the evidence

13

is legally insufficient to support this part of the trial court's judgment.  We sustain the defendants' first issue, reverse the trial court's judgment in part, and render judgment that UBS take nothing by way of its lawsuit.  In light of this disposition, we do not reach the defendants' three other appellate issues.  *See* TEX. R. APP. P. 47.1.

## II.  UBS's appeal

UBS appeals two of the trial court's pretrial rulings: the court's ruling on the parties' competing motions for partial summary judgment and the court's denial of UBS's motion for contractual attorney's fees.

### a.  Enforceability of confidentiality and nondisclosure agreements

UBS moved for partial summary judgment on the enforceability of the confidentiality and nondisclosure agreements signed by Ackley and the Maines.  It sought a ruling that the three nondisclosure agreements were not ambiguous and were enforceable.  UBS relied primarily on an express waiver of defenses in the agreements, which stated:

> Recipient hereby waives all claims and other allegations that could otherwise be raised as related to Provider's Confidential Information including but not limited to allegations that said Confidential Information (a) was in Recipient's possession prior to Provider's disclosure to Recipient, (b) was in the public domain prior to disclosure to Recipient, or (c) lawfully enters the public domain through no violation of this Agreement after disclosure to Recipient. This waiver is absolute and Recipient hereby agrees that all Confidential Information provided by Provider is subject to this absolute waiver such that no issues of fact exist whatsoever.

14

Recipient agrees that Provider shall have the power to initiate whatever legal proceedings it deems appropriate for a violation of this Agreement and, further, that this absolute waiver shall be sufficient to support a grant of summary judgment as related to Provider's disclosure of said Confidential Information. . . .

The defendants responded to UBS's motion for summary judgment with a cross-motion for partial summary judgment seeking a ruling that the nondisclosure agreements were unenforceable as a matter of law because:

(1) the NDA Agmts improperly define "Confidential Information" to <u>include</u> information: (a) that was equally available to Defendants prior to the NDA Agmts; (b) that was already in Defendants' possession prior to the NDA Agmts; (c) that was already in the public domain prior to the NDA Agmts; and ([d]) that lawfully entered the public domain after the NDA Agmts. A[] properly-drafted NDA agreement specifically <u>excludes</u> such information from the definition of "Confidential Information" because it is impossible to prove improper disclosure of the information is already in the public domain;

(2) UBS's purported "Confidential Information" was not, and is not, secret; and

(3) UBS had no possessory, proprietary, or ownership interest in the information and there is <u>no evidence</u> of improper disclosure or use causing harm to UBS.

The defendants argued that UBS's information about Check 21 was in the public domain, that UBS had no evidence that it owned the allegedly confidential information, and that the evidence conclusively showed that the allegedly confidential information was owned by other companies, specifically U.S. Dataworks, Inc., which owned the Clearingworks software, and companies owned

15

by Dennis Foster, which owned the Turbotransactions/CheckData software. The defendants relied on deposition testimony to show that UBS's allegations of improper disclosures pertained to information about Clearingworks software and Turbotransactions/CheckData software.

The trial court denied UBS's motion for summary judgment and granted the defendants' motion, without specifying the basis for its ruling. On appeal, UBS reurges the argument that it made in the trial court that the defendants waived all defenses to the enforceability of the nondisclosure agreement by the terms of that agreement. UBS's appellate briefing addresses the defendants' argument that the information that UBS sought to protect was in the public domain, but it does not address the defendants' arguments that the information actually belonged to other companies and that there was no evidence of improper disclosure or use causing harm to UBS.

An appellant may raise an issue that generally contends the trial court erred in rendering summary judgment, *see Malooly Brothers, Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970), but the appellant must also "present those arguments and supporting authority in order to merit reversal." *McCoy v. Rogers*, 240 S.W.3d 267, 272 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see Klentzman v. Brady*, 312 S.W.3d 886, 899 (Tex. App.—Houston [1st Dist.] 2009, no pet.) ("Although we recognize that such a broad [*Malooly*] issue is authorized, an

16

appellant must nevertheless also present argument and supporting authorities in support of that issue."). When multiple grounds for summary judgment exist and the trial court does not specify the ground on which it granted summary judgment, an appellant must negate on appeal all possible grounds, and if he fails to do so the appellate court must uphold the summary judgment. *See Star–Telegram, Inc. v. Doe*, 915 S.W.2d 471, 473 (Tex. 1995); *Ellis v. Precision Engine Rebuilders, Inc.*, 68 S.W.3d 894, 898 (Tex. App.—Houston [1st Dist.] 2002, no pet).

As authorized by *Malooly Brothers*, UBS's brief includes a broad issue challenging the trial court's denial of its motion for summary judgment and grant of the defendants' motion. UBS briefed its argument that the nondisclosure agreements were enforceable as a matter of law based on the defendants' waiver, lack of ambiguity, and a duty of confidentiality that it alleges the common law imposes on the defendants. UBS mentions the defendants' contention that the information was not protected because it was in the public domain, which they asserted in their competing motion for summary judgment. But UBS does not provide citation to any authority or any meaningful analysis of why the court would have erred in accepting that argument. UBS also did not address the defendants' alternative grounds for summary judgment, specifically that the evidence conclusively showed that the information UBS sought to protect was

owned by other companies and that there had been no showing of any breach of the nondisclosure agreements.

Because UBS did not brief these alternative grounds for summary judgment, we must overrule UBS's first issue without considering the propriety of granting summary judgment on the unchallenged grounds. *See Ellis*, 68 S.W.3d at 898; *McCoy*, 240 S.W.3d at 272.

### b. Contractual attorney's fees

In its second issue, UBS challenges the trial court's ruling on contractual attorney's fees. Both parties brought claims under the August 2005 sales agreement. UBS sued the defendants for violation of a covenant not to compete, and the defendants countersued UBS for breach of contract. The defendants prevailed on a pretrial motion for partial summary judgment, which held that the covenant not to compete was unenforceable. The defendants sought attorney's fees under the discretionary attorney's fees provisions of section 15.51(c) of the Texas Business and Commerce Code. The trial court denied the defendants' statutory attorney's fees.

At the time of trial, the defendants had a live counterclaim for breach of contract pertaining to the sales agreement of August 22, 2005. The jury found that UBS did not breach the sales agreement contract. UBS sought attorney's fees, arguing that it was the prevailing party under the contract, which provided:

18

> In the event that it is necessary for an Attorney to file suit or compel arbitration for the enforcement of this Agreement, the prevailing Party to such proceedings shall be entitled to recovery of its reasonable and necessary Attorney's Fees, expert's fees and costs of litigation/arbitration.

In a post-trial hearing, the trial court indicated that it believed there was no prevailing party under the 2005 sales agreement. The trial court explained that either both parties prevailed under the contract or neither party did because the defendants defeated UBS's claim of breach of covenant not to compete by way of pretrial summary judgment and UBS won on the breach of contract claim when the jury found that UBS did not breach the contract. The court stated,

> The Noncompete was knocked out and then Sales Agreement there was no violation of it. . . . And they prevailed under the Noncompete aspect of it by getting it knocked out of the case. So, it is really my belief that no one's entitled to attorney's fees under the Sales Agreement issue.
>
> . . . .
>
> So, you have an issue of attorney's fees for the Covenant Not to Compete. He has an issue for attorney's fees under the Sales Agreement because he could recover—he is going to argue that he can recover attorney's fees as the prevailing party under the Sales Agreement. . . . I am saying that it balances each other out. . . . I suspect it is going to balance each other out for the most part. And it may not zero each other out, but I am not going to award attorney's fees on this.

UBS challenges this ruling on appeal.

Whether a party is entitled to attorney's fees is a question of law that we review de novo. *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999).

19

Under Texas law, a court may award attorney's fees only when they are authorized by statute or by the parties' contract. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009). Under Texas statutory law, a party may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for breach of an oral or written contract. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008). However, "[p]arties are free to contract for a fee-recovery standard either looser or stricter than Chapter 38's . . . ." *Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). When parties include such a provision in a contract, the language of the contract, rather than the language of the statute, controls. *Id.* at 654–56 (reviewing definition of "prevailing party" under contract to determine whether plaintiff who had not recovered any actual damages was entitled to recover attorney's fees). When a contract does not define "prevailing party," we are to "presume the parties intended the term's ordinary meaning." *Id.* at 653.

A prevailing party is the party who successfully prosecutes a cause of action or defends against it. *Silver Lion, Inc. v. Dolphin St., Inc.*, No. 01-07-00370-CV, 2010 WL 2025749, at *18 (Tex. App.—Houston [1st Dist.] May 20, 2010, pet. denied) (mem. op.); *Weng Enters., Inc. v. Embassy World Travel, Inc.*, 837 S.W.2d 217, 222–23 (Tex. App.—Houston [1st Dist.] 1992, no writ). To be a "prevailing

20

party," a party must be successful on the merits of the claim. *Robbins v. Capozzi*, 100 S.W.3d 18, 27 (Tex. App.—Tyler 2002, no pet.). A prevailing party is vindicated by the court's judgment. *Id.* Thus, a plaintiff who receives a finding of liability but no damages is not a prevailing party for the purposes of attorney's fees. *See Intercontinental Grp. P'ship*, 295 S.W.3d at 653. But a defendant who successfully defends a cause of action is a prevailing party. *Silver Lion, Inc.*, 2010 WL 2025749, at *18; *Robbins*, 100 S.W.3d at 22–23, 27; *Weng Enters., Inc.*, 837 S.W.2d at 822–23; *see also Epps v. Fowler*, 351 S.W.3d 862, 868-69 (Tex. 2011) (holding that defendant is prevailing party for purposes of award of attorney's fees when plaintiff nonsuits case with prejudice).

As to the breach of contract claim regarding the 2005 sales agreement, UBS was the prevailing party because it successfully defended this claim and the jury found that it did not breach the contract. *See Silver Lion*, 2010 WL 2025749, at *18; *Robbins*, 100 S.W.3d at 27; *Weng Enters.*, 837 S.W.2d at 822–23. The parties' contract states that the prevailing party "shall" be entitled to recover attorney's fees. Under the parties' contract, UBS was entitled to attorney's fees, and the trial court erred by denying them. *See, e.g.*, *Robinson v. Budget Rent-A-Car Sys., Inc.*, 51 S.W.3d 425, 428 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (observing that word "shall" is ordinarily construed to be mandatory). Accordingly, we sustain UBS's second issue.

21

## Conclusion

Having held that the damages award is not supported by legally sufficient evidence, we reverse the trial court's judgment, in part, and render judgment that UBS take nothing on its suit. Further, having held that the trial court erred by denying UBS's request for attorney's fees as the prevailing party on the defendants' breach of the 2005 sales agreement cause of action, we reverse the trial court's judgment insofar as it does not award attorney's fees and remand for further proceedings thereon. We affirm the judgment of the trial court in all other regards.

Michael Massengale
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

22